UNITED STATES *v.* DESSY ENTERPRISES, INC. (No. 4968)[1]

United States Court of Customs and Patent Appeals,
November 16, 1959

*George Cochran Doub,* Assistant Attorney General, and *Richard E. FitzGibbon,* Chief, Customs Section for the United States.
*Stein and Shostak (Marjorie M. Shostak* of counsel), for appellee.

[Oral argument October 7, 1959 by Mr. FitzGibbon and Miss Shostak]

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK [2]

WORLEY, Chief Judge, delivered the opinion of the court:

The basic issue here is whether the importer overcame the presumption of correctness attaching to the collector's action in deny-

---

[1] C.A.D. 722.
[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell,* pursuant to the provisions of Title 28, United States Code, Section 294(d).

ing reduced duty on merchandise imported from the Western Zone of Germany under the provisions of Section 5 of the Trade Agreements Extension Act of 1951, 65 Stat. 72, T.D. 52772, 86 Treas. Dec. 277, and the Presidential Proclamations thereunder, T.D. 52788, 86 Treas. Dec. 300, and T.D. 52837, 86 Treas. Dec. 359.[3] Also involved is this court's interpretation thereof in *United States* v. *Hercules Antiques, The Danwill Company*, 44 CCPA 209, C.A.D. 662.

The merchandise described in the decision below as "glassware, wall plates, decorated china tableware, etc.," consists of several hundred items ranging from decanters to kitchen utensils. As best we can ascertain from an uncertain record some of the merchandise was treated as an import from West Germany and accordingly allowed reduced duty, but the collector denied reduced duty on the merchandise at bar presumably because of the appraiser's notation on the invoices reading: "All china and glassware of East German or Czecho origin unless otherwise noted—T.D. 52788—52837."

The Customs Court, one judge dissenting, C.D. 1993, sustained the importer's protest on the ground the importer had proved the collector wrong. In so doing the court stated that:

It is, of course, well-settled law that a plaintiff in bringing an action in this court against the decision or classification of a collector assumes the twofold burden of establishing that the collector's decision or classification was erroneous and that the classification he seeks is the correct one or that the relief he seeks is the proper action to be taken under the circumstances. In some cases, however, and the present case is an example, the very establishment of

---

[3] The pertinent portions of the Act and Proclamation read :

Sec. 5. As soon as practicable, the President shall take such action as is necessary to suspend, withdraw or prevent the application of any reduction in any rate of duty, or binding of any existing customs or excise treatment, or other concession contained in any trade agreement entered into under authority of section 350 of the Tariff Act of 1930, as amended and extended, to imports from the Union of Soviet Socialist Republics and to imports from any nation or area dominated or controlled by the foreign government or foreign organization controlling the world Communist movement.

The proclamation :

PART I

That the application of reduced rates of duty (including rates of import tax), established pursuant to trade agreements heretofore or hereafter entered into under the authority of section 350 of the Tariff Act of 1930, as originally enacted or as amended and extended (ch. 474, 48 Stat. 943 ; ch. 22, 50 Stat. 24 ; ch. 96, 54 Stat. 107 ; ch. 118, 57 Stat. 125 ; ch. 269, 59 Stat. 410 ; ch. 678, 62 Stat. 1053 ; ch. 585, 63 Stat. 697 ; Public Law 50, 82d Congress), shall be suspended with respect to imports from such nations and areas referred to in section 5 as may be specified in any notification pursuant to this part of this proclamation given by the President to the Secretary of the Treasury, and published in the *Federal Register*, which are entered, or withdrawn from warehouse, for consumption on such date as may be specified for each such nation or area in the notification, or are so entered or withdrawn thereafter until such date as may be so specified in a later notification and so published for the termination of such suspension. For the purposes of this part the term "imports from such nations and areas" shall mean articles imported directly or indirectly into the United States from nations or areas specified in an effective notification, but shall not in any case include articles the growth, produce, or manufacture of any other nation or area.

the error or invalidity of the collector's action also establishes the propriety or correctness of the relief sought.

In our opinion, however, the proof offered by the importer falls far short of that required to satisfactorily discharge its burden.

The record as a whole leaves much to be desired. Indeed, had it not been for the questions asked from the bench by the late Judge Ekwall,[4] who presided in his usual able and thorough fashion, it appears the record might well have been more barren of facts as distinguished from theories and assumptions. Several hundred items are involved, reliance as to their individual characteristics, including age and origin, was on invoices, the testimony of a Mr. Dessy, president of the importing firm, one Frederick Straus, also an importer, and pictures purportedly representative of some of the wide assortment of the imported articles. Since the views of the dissenting judge so fairly reflect our own evaluation of the evidence, as well as the applicability of *Hercules*, we take the liberty of quoting at length therefrom:

Under the pronouncements of the majority of our appellate court in the *Hercules Antiques et al.* case, as hereabove set forth, plaintiff, in this case, has not sustained its burden of proof. The principal witness was the president of the plaintiff corporation, who stated that he began importing glassware, chinaware, and earthenware, in July 1951, and that prior thereto he was "always sort of a hobbyist on these things." He stated that he bought the articles in question in the Western Zone of Germany from a dealer who had acquired them by advertising in local German papers, buying the things from homes and from the people. Although his testimony is generally to the effect that this merchandise consists of used articles, 40 to 50 years old, the witness admitted, in referring to certain glass items, that "they are even produced today." The witness testified further that part of the merchandise originated in the Western Zone of Germany and part of it originated in Bohemia, which is in the Eastern Sector of Germany, and "included behind the Iron Curtain," but there is no showing what quantity or quantities of the merchandise originated in each of the separate divisions of Germany.

In the *Hercules Antiques et al.* case, the majority of the court, finding the evidence to be insufficient, stated as follows:

Again, there is no evidence whatever as to the history of the specific articles before they were purchased from dealers in Holland. There is nothing to show when, where, how, why, or from whom they were purchased by the dealers, nor when they entered Holland. So far as appears from the record they might have been exported to Holland from Czechoslovakia for the purpose of immediate resale on the very day they were purchased by the importers' representative. On this record we cannot properly conclude from the fact that they were sold in Holland by antique dealers that they had entered Holland long before their sale. There is no apparent reason why antiques from Czechoslovakia cannot be bought directly from there and resold by dealers in Holland. Similarly, the dealers in Holland from whom the merchandise was purchased might well have been acting as agents for persons in Czechoslovakia.

---

[4] Judge Elkwall presided at the trial but did not participate in the decision appealed from.

What is stated in the foregoing quotation had equal application, with the same force and effect, herein concerning plaintiff's proof in this case. There is no showing herein as to "when, where, how, why, or from whom" the articles in question were obtained by the German dealer from whom plaintiff purchased them, nor when they entered the Western Zone of Germany. So far as appears from the record, all of the merchandise in question might have been received by the German dealer (the foreign exporter) from the Eastern Sector of Germany or from communist-dominated territory, for the purpose of re-sale on the very day purchase thereof was made by plaintiff's representative. It cannot be concluded from this record that the particular articles under consideration entered the Western Zone of Germany long before their sale by the German dealer to the plaintiff.

There is a presumption, under the collector's classification, that the merchandise in question was "imported directly or indirectly" from the Soviet Zone of Germany, or the Soviet Sector of Berlin, or other communist-dominated territory. To overcome such presumption, it was incumbent upon plaintiff to show, by proper evidence that the connection between the specific articles involved herein and a communist-dominated country or territory "had been so effectively broken that they could no longer be regarded as imports from that country," * * *.

Although we did our best in *Hercules* to state as clearly as we could what we thought Congress intended the statute to accomplish, it appears that some of the reasoning below indicates we were not completely successful in that respect. An example, and we quote directly from the majority opinion rather than chance a possible misinterpretation, is the following:

The question thus posed is whether the proscription of section 5 of the Trade Agreements Extension Act of 1951 and of the applicable portions of the Presidential proclamation relating thereto applies only to imported merchandise which was the growth, produce, or manufacture of communist dominated or controlled nations or areas *since such nations or areas became so dominated or controlled,* or whether it applies as well to merchandise which was grown, produced, or manufactured in those nations or areas before they became communist dominated or controlled.

The statute and proclamation require the tariff status of imported merchandise to be determined by the political complexion of the nation or area of growth, produce, or manufacture, and of the nation or area from whence imported. They are ambiguous in that they do not indicate the result intended in the situation which has arisen here, where, even assuming without deciding that the merchandise was the manufacture of East Germany or Czechoslovakia, it clearly appears that such manufacture took place before those nations or areas acquired their present political status. Recourse to such of the legislative history of the provisions as is available to the court fails to resolve the ambiguity.

We are of the opinion that where, as here, a law imposing a tariff duty is susceptible of two interpretations, one favorable to the taxpayer and one against, there should be applied the well-settled rule expressed in the opinion of the Supreme Court in the case of *American Net and Twine Company* v. *Worthington,* 141 U.S. 468, at page 474 (35 L. ed. 821, 824).

We take the above to mean that the statute and proclamation might be so construed as to require a distinction between those goods manu-

factured *prior* to Communist domination and those manufactured *after* such domination. However, as we tried to point out in *Hercules*, the obvious purpose of the statute is to deny to Communist-dominated countries the benefit of reduced duties; therefore, it would seem immaterial at what time the goods were produced. Indeed, it appears that a different conclusion would lead to a granting of reduced duty on so-called "old" articles of commerce exported from Iron Curtain countries and denial of such reduction to so-called "new" articles.

Again, the majority was of the view that inasmuch as the instant merchandise was valued in West German currency it should be regarded as a direct import therefrom. It is appropriate to note, however, that in *Hercules*, although the goods there were valued in the currency of Holland, they were not held to be a direct import from that country.

Our review of the above is prompted by a desire to clarify as best we can any language in the *Hercules* decision which might aid in future controversies arising under this particular section and the proclamations thereunder.

Since the *Hercules* decision is so factually similar and so applicable in principle as to be controlling here, it becomes necessary to *reverse* the judgment appealed from.